IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                                                    PLAINTIFF

vs.                                          Case No. 2:11-CR-20053

CARLTON HIGHTOWER                                                                          DEFENDANT

**ORDER**

      Before this Court is Defendant Hightower's Motion to Suppress (Doc. 13) and USA's Response (Doc. 14) to Defendant's Motion. The Court held a hearing on the Motion on January 4, 2012. All parties appeared at this hearing, and Defendant Hightower was represented by counsel. At this hearing, Officers John O'Brien and Mike Haney of the Paris, Arkansas Police Department testified. Defendant Hightower also testified. Trial in this matter is currently set for January 18, 2012. The Court, having reviewed all the relevant briefing and testimony at the hearing, and for the reasons set forth below, finds that Defendant's Motion to Suppress should be DENIED.

**I. Background**[1]

      On August 26, 2011, at approximately 1:15 p.m., Officers Haney, Howard, and Chief John O'Brien of the Paris Police Department were dispatched to the Paris Boys' and Girls' Club ("the Boys' Club") based on a call received by the Department from an anonymous male. While the exact contents of the call are unknown, it seems that the caller simply stated something to the effect that officers were needed at the Boys' Club and then hung up. Hang up calls are treated like 911 calls by the Paris Police Department as the Department has no way of tracking which calls are forwarded

---

[1] The background is taken from the parties' briefs as well as testimony presented at the hearing.

by the 911 dispatchers and which are received directly by the Department. Thus, the officers responded to this call as an emergency call. Officer Howard arrived at the Boys' Club first followed by Officer Haney and then Chief O'Brien. After arriving and checking with persons inside the Boys' Club, Officer Howard determined that there were no problems that required police attention at that location and relayed that information to Officer Haney when Haney arrived at the Boys' Club. The officers were also informed that nobody from the Boys' Club had called the police. Chief O'Brien met Officers Haney and Howard as they were exiting the Boys' Club. Haney and Howard informed O'Brien that there was no problem at the Boys' Club. O'Brien then told Haney and Howard that he had noticed a group across the street at an apartment complex as he pulled up to the Boys' Club. O'Brien informed the other officers that the call was probably regarding what was happening across the street as he had observed and heard what looked and sounded like an argument. Defendant denies that any argument was taking place, and testified that he was amongst friends.

Deputy Sheriff Hobbs also arrived on the scene, and the four officers proceeded toward the parking lot across the street. As the officers began to cross the street from the Boys' Club to the apartment complex, the group of ten to fifteen people began to disperse. The officers observed Defendant and a female companion get into a car and begin to back out of the parking lot. The car windows were open, with the car moving at a slow rate of speed, and officers yelled for Defendant to stop. As Defendant put his car in drive, Officer Hobbs stepped in front of the car and pulled his taser, again demanding that Defendant stop. Defendant continued forward for maybe a few feet, at which point Officer Haney, who was at Defendant's driver's side window, pulled his firearm and again ordered Defendant to stop. Defendant testified that it was only at this point that he heard the order to stop and he then complied. The officers ordered Defendant to exit his vehicle. Defendant

2

first rolled up his windows and locked the car doors and then complied by voluntarily exiting his vehicle. When Defendant exited the vehicle he was told that the police were investigating a call from the area and that he would need to remain at the scene until the police had completed their investigation. Other people from the group had also been stopped and were likewise questioned by the officers about what was going on. Defendant was agitated upon exiting the vehicle. Officer Haney had smelled alcohol coming from the inside of the vehicle when the driver's side window was open, and had also observed some beer bottles – both opened and unopened – on the passenger side. The officers asked Defendant if he had been drinking. Defendant answered affirmatively and told the officers to arrest him.

Mr. Hightower refused to consent to a search of the car. After determining that the car was not properly insured, the car was towed and an inventory search was performed prior to the car being towed. The search resulted in the finding of both marijuana and a firearm.

**II. Analysis**

Defendant Hightower filed the present Motion to Suppress contesting the constitutionality of the officers' stopping his car and subsequent search. Defendant argues that the officers' stop of Defendant was unlawful because there is no evidence that Defendant committed a traffic violation or that his car had equipment problems, nor did the officers otherwise have probable cause or reasonable suspicion to make the stop. Defendant argues that the police were in the area because of an unrelated call, and there is no evidence that anything illegal was occurring at the apartment complex. It appears that the only issue in dispute is whether the officers were justified in their initial stop of Defendant Hightower, and the Court will therefore focus on the events leading up to the stop as opposed to any events occurring subsequent to the stop.

Defendant Hightower contests the stop of his vehicle. The Court does not view the officers' stop of Defendant's vehicle as a "traffic stop." The officers were attempting to detain all persons involved in a group of about 10-15 people that were standing in front of an apartment complex. Most were stopped simply walking back into or towards the complex. The fact that Defendant was attempting to leave the scene in a car is the only circumstance that would initially distinguish the officers' stop of Defendant from the officers' stop of the other persons present at the scene. Furthermore, Defendant was traveling at a very low rate of speed simply backing out of a private parking lot. The officers stopped him on foot. They did not pull him over on a public roadway in their patrol vehicles. The Court therefore finds immaterial Defendant's arguments concerning the fact that Defendant committed no moving or equipment violations which would prompt a traffic stop. Nor does the government seem to argue that the stop was made due to a traffic violation. Rather, the government's position is that the stop was made pursuant to an investigation the officers' were conducting related to a call received by the Paris Police Department. Regardless, the standard for a temporary detention under *Terry v. Ohio*, is the same regardless of whether a defendant is in a car or on foot. 392 U.S. 1 (1968); *see also United States v. Bell*, 480 F.3d 860, 863 (2007). "Automobiles, as well as people, are subject to *Terry* stops." *United States v. Watts*, 7 F.3d 122, 124 (8th Cir. 1993).

Officers may make brief, investigatory stops based on a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30); *see also United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006). In evaluating the validity of a stop, the Court must consider "the totality of the circumstances – the whole picture." *Id*. at 8 (quotation omitted). A reasonable, articulable suspicion may be formed by

4

observing exclusively legal activity. *See Illinois v. Wardlow*, 120 S. Ct. 673, 677 (2000) (finding that defendant's unprovoked flight from officers in an area of heavy narcotics trafficking supported reasonable suspicion that defendant was involved in criminal activity). "(T)he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Sokolow*, 490 U.S. at 10 (quoting *Illinois v. Gates*, 462 U.S. 213, 243-244, n. 13 (1983)). Officers may consider a person's behavior when the person becomes aware of the officer's presence. *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlaw*, 528 U.S. at 124. Overall, in considering the totality of the circumstances, where there are specific and articulable facts that, taken together with the rational inferences that may be drawn from those facts, that would reasonably warrant an officer to make a stop, the officer is justified in making the stop. *Terry*, 392 U.S. 1, 21. Even a series of innocent acts, taken together, may warrant further investigation. *Id.* at 22.

The officers in this case were initially dispatched to the Boys' Club based on a call that officers were needed there. The officers determined that there was no disturbance at the Boys' Club and made the reasonable assumption that the hang-up call was made concerning a group of people who appeared to be arguing across the street. Since hang-up calls are treated as emergency calls by the Paris Police Department, the officers made the reasonable decision to cross the street to the apartment complex and investigate what was happening. Both Officer Haney and Chief O'Brien testified that people in the group were posturing as if they were about to, or had already been, fighting. O'Brien also testified that he heard raised voices and unsavory language. Both officers testified that the Paris Police Department had often received calls regarding fights or other criminal

5

activity from that apartment complex on prior occasions. As the officers approached the group, the group dispersed. The officers stopped several people for questioning, including Defendant, who attempted to drive off in his car. From the officers' perspective, Defendant ignored repeated orders to stop, and continued to attempt to flee.

Given the nature of the call received by the Paris Police Department, the history of criminal activity at the apartment complex, the behavior of the group of people gathered out front, and Defendant's own behavior, the officers had a reasonable suspicion that Defendant Hightower was involved in criminal activity. The Court finds that there existed reasonable suspicion to allow the officers to stop Hightower's vehicle based upon the totality of the circumstances and the collective observations of the officers. The officers were discharging a legitimate investigative function in approaching and stopping Defendant for questioning. *See Terry*, 392 U.S. at 22 (stating that the officer was discharging a legitimate investigative function when he decided to approach the petitioner and his companions, who had been standing together on a street corner, and that "[i]t would have been poor police work indeed" for the officer to fail to investigate further, based on a totality of the circumstances). Thus, there was no constitutional deficiency with the officers' stop of Defendant Hightower, and Defendant's Motion to Suppress is DENIED.

### III. Conclusion

For all the reasons set forth above, IT IS THEREFORE ORDERED that Defendant Hightower's Motion to Suppress (Doc. 13) is **DENIED.**

IT IS SO ORDERED this 11th day of January, 2012.

/s/ P. K. Holmes, III
P.K. HOLMES, III
UNITED STATES DISTRICT JUDGE

6